## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISON

| | | |
|---|---|---|
| **JONATHAN WILLIAMS,** | ) | |
| **Claimant,** | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| **NANCY A. BERRYHILL,** | ) | **4:17-CV-00453-KOB** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| **Respondent.** | ) | |

### MEMORANDUM OPINION

### I. INTRODUCTION

On August 1, 2013, the claimant, Jonathan Williams, protectively applied for disability and disability insurance benefits under Title II of the Social Security Act and for supplemental security income under Title XVI. In both applications, the claimant alleged disability commencing on November 13, 2011, because of bipolar disorder, manic depression, suicidal ideation, ulcerative colitis, neck and back impairments, and a wrist injury. The Commissioner denied the claims on December 5, 2013. The claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ) on December 10, 2013, and the ALJ held a hearing on April 22, 2015. (R. 12, 155, 172).

In a decision dated September 17, 2015, the ALJ found that the claimant was not disabled as defined by the Social Security Act, rendering him ineligible for Social Security benefits. On January 18, 2017, the Appeals Council denied the claimant's requests for review. Consequently,

1

the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUES PRESENTED

The issue before the court is whether the ALJ accorded proper weight to the opinions of the claimant's treating physician Dr. James Yates. Although the claimant raised other issues on appeal, the court does not reach those issues because it will reverse on this issue.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. §405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational

factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The ALJ must state with particularity the weight he gave different medical opinions and the reasons for that weight, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must give the testimony of a treating physician substantial or considerable weight unless the ALJ shows "good cause" to the contrary. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). As the Eleventh Circuit explained:

> [G]ood cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's

> own medical records. *Id.* When electing to disregard the opinion of a
> treating physician, the ALJ must clearly articulate its reasons.

*Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d

1436, 1440 (11th Cir. 1997).

When the ALJ fails to state specific reasons for not giving a treating physician substantial

weight or if his articulated reasons lack substantial evidence, he has committed reversible error.

*See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was thirty-seven years old at the time of the ALJ's final decision; has a 10th

grade education; has past relevant work as a data clerk and janitor; and alleges disability based

on bipolar disorder, manic depression, suicidal ideation, ulcerative colitis, neck and back

impairments, and a wrist injury. (R. 23, 155,172, 183).

### *Physical and Mental Impairments*

On January 18, 2006, the claimant went to the Northeast Alabama Regional Medical

Center complaining of neck and left shoulder pain. Dr. David Bodne ordered a cervical x-ray that

showed normal results. Later that year, the claimant once again went to Northeast Alabama

Regional Medical Center on June 4 seeking treatment for bloody stools and abdominal pain and

was admitted until June 9. The claimant informed Dr. Vishwanath Reddy that he has a past

medical history of "opiate abuse," and "subsequent chronic methadone dependence, followed by

a methadone clinic." Dr. Reddy ordered a colonoscopy that showed an acutely inflamed large

bowel. Dr. Reddy diagnosed the claimant with ulcerative colitis, anxiety, depression, and a

history of chronic narcotic dependence. Dr. Reddy prescribed the claimant Levaquin 500 mg IV,

Flagyl 500 mg t.i.d., and Azulfidine. (R.404-410, 421, 434).

On March 9, 2009, the claimant saw Dr. James Yates, an internist, at the Jacksonville Medical Center, seeking to establish himself as a patient. The claimant reported to Dr. Yates that he was diagnosed with ulcerative colitis and has bouts of upper abdominal cramping and "mucous-like stools." Dr. Yates noted the claimant was an "alert," "well-developed, well-nourished white male in no acute distress." Dr. Yates further noted that the claimant's depression questionnaire was "positive on all the questions."[1] Dr. Yates diagnosed the claimant with ulcerative colitis, inguinal lymphadenopathy, and depression. (R. 460).

From that point, the record contains no relevant medical evidence until December 16, 2010, when the claimant again saw Dr. Yates, complaining of "back pain into his shoulders and [legs]." During his physical examination of the claimant, Dr. Yates noted the claimant had "tenderness in the lower cervical and lower lumbar area," and that the claimant straight leg testing was "negative." He diagnosed the claimant with degenerative disc disease of the cervical and lumbar area and prescribed Vicoprofen and Klonopin. (R. 459).

The claimant returned to Dr. Yates on March 31, 2011, when Dr. Yates noted "no change in [the claimant's] examination." He additionally noted that the claimant continued to have "slight upper lumbar tenderness." Dr. Yates prescribed acetaminophen and hydrocodone and refilled his Klonopin prescription. (R. 459).

Then on November 13, 2011, the claimant returned to the Northeast Alabama Medical Center following a suicide attempt. The attempt resulted in a laceration of his flexor tendons, ulnar artery, median nerve, and ulnar nerve on his left wrist. Dr. Dewayne Clark and Dr. Duane Tippets performed an operation on the claimant's left wrist, repairing most of the injuries. At a

---

[1] Dr. Yates did not indicate what he meant by "positive."

follow-up visit on January 10, 2012, Dr. Tippets noted that the claimant has diffuse contracture of the fingers and that the claimant's recovery would likely be very limited. (R. 439-449, 454).

On August 6, 2012, the claimant again saw Dr. Yates, following another suicide attempt. Dr. Yates noted that the claimant "has quite a bit of problem with depression including the suicide attempt" and that he "needs to get back on some medications." Dr. Yates noted the claimant continued to have degenerative disc disease and chronic pain syndrome and prescribed the claimant Lortab as needed for pain and Klonopin for his depression. (R. 457).

On October 16, 2012, the claimant met again with Dr. Yates for a follow-up appointment. Dr. Yates noted the claimant's pain symptoms were "about the same." Dr. Yates refilled the claimant's previous medications. (R. 457).

The claimant returned to Dr. Yates for another follow-up appointment on March 27, 2013. Dr. Yates noted that the claimant was "overall doing fairly well," and made an assessment of generalized anxiety disorder classified as "slightly symptomatic." Dr. Yates additionally noted that the claimant's chronic pain syndrome from the degenerative disc disease was stable and prescribed the claimant Klonopin, Lortab, and Cymbalta. (R. 456).

On August 9, 2013, the claimant again saw Dr. Yates. Dr. Yates noted that the claimant informed him that he was going out of town and needed his prescriptions for Klonopin and Lortab refilled that same day. (R. 455).

One month later, on September 9, 2013, the claimant had another appointment with Dr. Yates, where he complained of pain in a specific area of his back. Dr. Yates found a "localized spasm at about L1 on the right." Dr. Yates noted the claimant's chronic pain syndrome was the "same," and diagnosed him with a "localized muscle spasm in [his] upper lumbar area." Dr.

Yates prescribed the claimant tizanidine and tramadol and refilled his Lortab and Klonopin prescriptions. (R. 455).

At the request of the Social Security Administration, the claimant's mother, Deborah Oliver, completed a "Function Report-Adult-Third Party" on October 2, 2013. Ms. Oliver stated that she spends "maybe two to three hours a day" with the claimant. Ms. Oliver further stated that the claimant needs help to button his shirt; can bathe, care for his hair, and shave, but delays doing so; can feed himself "but spills food a lot"; and can use the toilet. Ms. Oliver explained that the claimant can do laundry, mow the grass if riding a lawn mower, and load the dishwasher "five or six times a month." Ms. Oliver also mentioned that the claimant goes outside every day and can drive a car but "doesn't like to." Ms. Oliver further stated that the claimant shops for groceries and personal items in a store "once a week," but he "gets back as quick as possible." Ms. Oliver stated that the claimant does not have any problems getting along with others; can walk a "couple blocks" before needing to stop; has to rest for a "few blocks" before walking again; can pay attention for thirty to forty-five minutes; follows written and spoken instructions "good"; gets along well with authority figures "unless they have attitude"; and has fears of "bad things wrong with him mentally and physically." Ms. Oliver also stated that the claimant was never fired or laid off from a job because of problems getting along with other people. (R. 296-303).

On October 7, 2013, the claimant also completed a "Function-Report-Adult" similar to the report completed by his mother. The claimant stated that, upon waking up, he stays in bed and the only time he does anything else is "if [he] has laundry to do," or if he needs to "clean [his] room." The claimant further stated that, if needed, he cleans the house as well. The claimant listed cleaning, vacuuming, laundry—with the exception of "folding and washing"—and

sweeping as household chores he can do; he reported it takes him "at least an hour and a half to do anything." The claimant additionally reported that he does not do yard work "most of the time" because he is "too depressed or physically unable to do it." (R. 305-07).

He further reported that he can dress and feed himself. He does not "worry about" shaving or caring for his hair, because he "really [doesn't] care to"; however, he mentioned he can trim his beard with a trimmer. The claimant further reported that he does not prepare meals because of difficulty in holding utensils with his left hand. The claimant also stated that he can travel by driving and walking, and he can go out and drive alone. (R. 305-309).

Regarding his social activities, the claimant stated that he "very rare[ly]" spends time with others because he "[doesn't] get out much." He also mentioned that he regularly goes to his daughter's games to watch her cheer and goes to his friend's houses to "hangout to help get things off [his] mind" and does not need anyone to accompany him. In addition, the claimant further stated that he does not prefer social activities at his house, because he does not like to be around people he does not know or around many people. He has never been fired or laid off from a job because of problems getting along with other people. The claimant articulated he is becoming more "unsociable" because of his "nerves" and "depression." (R. 309-10, 311-12).

Regarding his abilities, the claimant stated that he can "only lift a few pounds"; can "only stand for short periods of time"; walk up to 100 yards; and has to rest for "at least ten to fifteen minutes" after walking further. The claimant additionally stated that he does not finish what he starts; he follows written instructions "pretty good"; follows spoken instructions the best he can; gets along "pretty well" with authority figures; does not handle stress well; does not handle changes in routine well; and experiences fear when seeing someone being cut in a movie. (R. 310-11).

At the request of the Social Security Administration, Dr. Hasmukh Jariwala, an internist, evaluated the claimant's physical condition on November 14, 2013. Dr. Jariwala personally examined the claimant and reviewed his records from Northeast Alabama Regional Medical Center and Jacksonville Medical Center. The claimant reported pain in his neck and lower back for the past ten to fifteen years, describing the pain as "a constant nagging pain that becomes sharp on exertion." He also complained of experiencing stiffness in his joints in the morning, lasting for "about thirty minutes." The claimant additionally stated that he can "bend, stoop, and lift five to ten pounds with the right hand"; that he hurt his back and neck "many years ago" when he was working as a mover; and that, in 2005, doctors told him that he had a bulging disc along with arthritis in his neck and lower back.[2] He stated that his medications "help about fifty percent." (R. 466).

In addition, the claimant complained of inability to use his left wrist and stated he "cannot hold a cup or open jars, bottles, etc . . . with his left hand." Dr. Jariwala noted that the claimant had hypersensitivity in his left hand and left wrist, loss of muscle mass in his left hand, and an inability to touch his left thumb to his left fourth finger. Dr. Jariwala additionally noted that the claimant had a weak handgrip and could not form a complete fist. He listed the claimant's medications as Klonopin, Lortab, Motrin, Cymbalta, and a multivitamin. (R. 467).

Concerning his mental health, the claimant reported to Dr. Jariwala that doctors diagnosed him with depression as a child and that he was hospitalized at ages fourteen and fifteen for depression. The claimant stated he "feels lonely and doesn't want to do anything" and he "doesn't like to be around" people. He also stated that he still has occasional suicidal ideations and the antidepressant prescribed by Dr. Yates "helps about fifty percent." (R. 466).

---

[2] No records reflect this diagnosis.

During his physical examination of the claimant, Dr. Jariwala noted no impairment of the claimant's gastrointestinal function, although the claimant complained of poor appetite and weight loss. Additionally, Dr. Jariwala noted that the claimant did not have any problems with rectal bleeding, impairments of his back joints, or actions with his right hand. Dr. Jariwala reported that the claimant was able to "button, tie his shoelaces, pick up small objects, hold a glass, and turn the doorknob" with his right hand, but the left hand could not perform any of these tasks. Dr. Jariwala also noted that the claimant's left hand contained nerve damage and had a grip strength of "2/5," and the right hand was "5/5." (R. 469).

The Social Security Administration also requested that Dr. Dana K. Davis, a psychologist, perform a mental evaluation of the claimant. On November 15, 2013, Dr. Davis personally examined the claimant's mental condition and reviewed his medical records. The claimant complained of a recurring depressive state and that he felt like a "burden" to his mother and daughter. He also stated he felt overwhelmed by his unemployment and financial strain. The claimant reported two suicide attempts, one in 2010 when he overdosed on pills but did not seek medical help, and then in 2011 when he cut his left wrist. He further stated that his depression was "based on different psychosocial problems," and that in 2011 his girlfriend broke up with him, causing him to feel "hopeless." (R. 471-73).

Dr. Davis noted that the claimant was treated by Dr. Yates with medications for symptoms of generalized anxiety and situational depression. Dr. Davis listed the claimant's medications as hydrocodone, clonazepam, and Cymbalta. (R. 471-73).

Regarding his activities of daily living, the claimant told Dr. Davis that he is able to take care of himself; help his mother during the day; watch television; go to the grocery store; and run

errands. He further stated he sleeps well and has a "fair" appetite that was "not as good as it generally has been." (R. 472).

During her psychological examination of the claimant, Dr. Davis noted that the claimant was "pleasant, rather talkative." She also noted that "perhaps he exaggerated a bit throughout the interview and may not have been a totally credible client." Dr. Davis' diagnoses included "mild to moderate" symptoms of generalized anxiety and situational depression. (R. 471-475).

At a follow-up examination with Dr. Yates on November 25, 2013, the claimant reported doing "fairly well" but still having pain, although his back spasms had decreased. A few months later on February 12, 2014, the claimant reported to Dr. Yates that that he was feeling "okay" but had poison oak from cutting some wood for the fireplace. Dr. Yates continued the claimant on all of his current medications. (R. 479-80).

The claimant again went to Dr. Yates on January 14, 2015 following a fracture to his right ankle approximately two weeks prior. The claimant reported that he went to the Emergency Department at Citizens Baptist Health Center on December 31 and an x-ray showed a fracture in his right ankle. The claimant stated that he borrowed a boot to place on the ankle from a friend and bought crutches from a store. In addition, the claimant explained he could not afford to see an orthopedic doctor. During his physical examination, Dr. Yates noted that the claimant had an improved lower "bike" leg. Dr. Yates prescribed the claimant Klonopin, Tizanidine, and Tramadol for pain. Dr. Yates discontinued Percocet for pain on this date, but later prescribed Percocet again on February 17, 2015. (R. 478).

On February 25, 2015, the claimant went to the Emergency Department at St. Vincent's East, complaining that he had "bipolar disorder, depression," and had a "suicide attempt in 2012." Dr. Simon McClure, the attending physician, noted that the claimant had "some vague

reported symptoms of suicidal ideations and anger." The claimant informed Dr. McClure that he

was hospitalized in a psychiatric hospital when he was fifteen years old and had "some sort of

psychiatric evaluation in 2012 but is not in treatment at this time." The claimant further

mentioned to Dr. McClure that he was experiencing some anger towards his brother, but Dr.

McClure noted that the claimant failed to state the connection with his suicidal ideations. Dr.

McClure listed the claimant's medications as Klonopin and Percocet. Dr. McClure recommended

that the claimant see a counselor. (R. 542-45).

On March 3, 2015, the claimant went to Cheaha Mental Health, complaining to the

physician[3] that he "stay[s] depressed," "mainly went in there for therapy," and "[has] bad

thoughts." The physician noted that the claimant's current mental status was "appropriate",

orientation "normal", and memory "intact." The physician diagnosed the claimant with recurring

major depressive disorder and borderline personality disorder. (R. 528-31).

On April 20, 2015 the claimant again went to the Citizens Baptist Medical Center,

arriving "unresponsive" and "foaming at the mouth." After the claimant stabilized, he stated that

he needed medication to "calm his nerves." Attending physician Dr. Nilam Chiman Patel, noted

that the claimant was "positive for dysphoric mood" and was "nervous/anxious." Dr. Patel

further noted that the claimant denied any suicidal or homicidal ideations. Dr. Patel listed the

claimant's medications as Lortab, Advil, Motrin, Lopressor, Klonopin, and a multivitamin. (R.

590, 592-93).

At the request of the claimant's counsel, Dr. Yates completed a questionnaire on April

20, 2015. He indicated that the claimant could lift over ten pounds occasionally; sit for six hours

in a work day; could not climb ramps/stairs; and occasionally balance; stoop; kneel; crouch; or

---

[3] The only record showing the physician's name is illegible.

crawl. Dr. Yates reported that the claimant's condition does not affect his ability to use his hands and that he would need hourly breaks. Dr. Yates further reported that the claimant would miss at least five days per month from work and would not be able to successfully concentrate and focus on tasks. Dr. Yates also stated the claimant has social phobia. (R. 583-85).

*The ALJ Hearing*

At the hearing before the ALJ on April 22, 2015, the claimant testified that he worked as a data clerk until around November 13, 2011. He said that he stopped working because he was "mentally built up" and "couldn't do the job"; worked anywhere from forty to seventy hours per week; and felt his back worsened as a result of working while he had pain. He articulated that he cannot work because of "mental and physical problems." The claimant testified that he previously worked as a janitor. He stated that this job consisted of keeping the area clean; stripping, waxing, buffing, cleaning and vacuuming the floors; and emptying trash cans. (R. 41, 47-48, 62, 74, 93).

The claimant stated that he was capable of brushing his teeth with his right hand, using his left hand to place the toothbrush on the counter to squeeze toothpaste with his right hand; learned how to tie his shoelaces after nearly a year; could stand/walk up to "roughly" thirty minutes; could help his daughter with her homework that consisted of problems such as "two plus two"; could lift up to ten pounds with his right hand; and could sit for up to thirty minutes, but he would have trouble with back and ankle pain if he sat for a long period of time. Moreover, the claimant mentioned his left hand is positioned as if he is "trying to make a fist" and that he has to sit on it to open his fingers. (R. 41-45).

The claimant further stated that his anxiety problems date back to when he was a child watching his mother being abused and experiencing physical and mental abuse throughout his

life. The claimant testified that he has anxiety trouble in a social setting, stating he feels as if "important people are better than [him]." Additionally, the claimant stated that he talks to his mother when he has depressive thoughts and that she is his "confidant." During the hearing, the claimant had to be excused for a portion of time because of symptoms such as chest tightening and stuttering. (R. 49, 60-61, 64-65, 75-80).

When asked to describe a normal day, the claimant stated he typically wakes up and gets his daughter up for school. He lives with his mother, brother, and ex-wife, who are all disabled. The claimant mentioned that he physically cannot help his daughter get ready for school so his mother, ex-wife, and brother help. The claimant also stated that his family takes his daughter to school because he is unable to do so. In addition, the claimant mentioned he spends the day watching TV in his room with the door closed because he "doesn't want to talk," except when his daughter comes home and he helps her with her homework. (R. 66-70).

The claimant's mother Deborah Oliver, also testified at the hearing, stating that the claimant "stays in his bedroom," and that he struggles with going to the doctor because "he gets so nervous and upset when he goes that he starts having real bad anxiety." Ms. Oliver further stated that the claimant cannot "deal with the people in the house, with his own family, so he just stays in the bedroom." When asked what the claimant is capable of doing, Ms. Oliver testified he is capable of using the bathroom, but he cannot prepare his own meals or drinks. His family has to prepare meals and carry them to him. Additionally, Ms. Oliver stated that the claimant experiences difficulty in helping his daughter with her homework. She attempts to talk to the claimant but he informs her that if he tells her what is in his mind, it will "scare her." (R. 106-115).

A vocational expert Renee Smith, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Smith testified that the claimant's past relevant work was as a data clerk, classified as sedentary, semiskilled work; and a janitor, classified as heavy, unskilled work. The ALJ asked Ms. Smith to assume a hypothetical individual the same age, education, and experience as the claimant with a residual functional capacity to perform medium work who can occasionally stoop and crouch; never climb; never drive; never use right foot controls; never use his left upper extremity for pushing/pulling; has a restriction to simple, non-complex tasks; and primarily works with or around things as opposed to the general public.

Ms. Smith testified that the hypothetical person could perform medium work as a broom bundler, classified as unskilled work, with 40,000 jobs available nationally and 1,500 jobs in the state; a cloth sander, classified as unskilled work, with 100,000 jobs available nationally and 1,000 jobs in the state; and an industrial cleaner, with 1,000,000 jobs nationally and 8,000 in the state. (R. 118). With those same limitations, Ms. Smith also testified that the hypothetical individual could perform light and sedentary work as a marker, classified as light, unskilled work, with 800,000 jobs available nationally and 6,000 in the state; a sorter I, classified as light, unskilled work, with 200,000 jobs nationally and 4,000 in the state; a hotel housekeeper, classified as light, unskilled work, with 400,000 jobs nationally and 3,500 in the state; a dowel inspector, classified as sedentary, unskilled work with 200,000 jobs nationally and 3,000 in the state; a cuff folder, classified as sedentary, unskilled work with 300,000 jobs nationally and 6,000 in the state; and a table worker, classified as sedentary, unskilled work with 200,000 jobs nationally and 4,000 in the state. (R. 118-19).

In his second hypothetical, the ALJ asked Ms. Smith to assume all of the prior limitations except the individual could only use his left hand to assist his right hand and never for any gross

manipulation or fine fingering. Ms. Smith testified that individual could not return to the claimant's past work as a data clerk/proofreader or any of the medium or sedentary level jobs previously mentioned. But Ms. Smith testified that individual could perform the light jobs of marker and sorter I, but not the job as a hotel housekeeper. (R. 119-20).

Next, the ALJ asked Ms. Smith to assume the facts of the original hypothetical, with the exception that the individual cannot meet production goals or quotas. Ms. Smith testified that individual could perform the light, sedentary, and medium level jobs previously listed and could perform the claimant's past work as a data clerk/proofreader. (R. 121-22).

In his next hypothetical, the ALJ asked Ms. Smith to assume the original limitations except that the individual can only stand and/or walk for thirty minutes at a time and sit up to thirty minutes at a time. Ms. Smith articulated that no jobs existed for such an individual. (R. 122).

In addition, the ALJ asked Ms. Smith to consider the original hypothetical but include that the individual could only have occasional contact with coworkers and supervisors. Ms. Smith testified that limitation "would not take him out of past work or out of the jobs that I identified for this individual." However, she stated that a limitation of no contact with coworkers or supervisors would preclude gainful employment. Ms. Smith also indicated that a normal eight-hour workday would require being off task no more than 15% of the workday and not missing more than two days per month. (R. 120 -26).

During the hearing, the claimant's attorney orally requested that the ALJ order a consultative psychiatric examination, but the ALJ indicated he would not accept oral requests and instructed the attorney to put his request in writing. The ALJ indicated he would keep the record open for 45 days. (R. 149-50).

On May 3, 2015, the claimant's attorney submitted a written request for a psychological/psychiatric consultative examination because of the claimant's severe psychological impairments. (R. 586-87). The record contains no such consultative examination.

*The ALJ 's Decision*

On September 15, 2015, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2016 and had not engaged in substantial gainful activity since his alleged onset date of November 13, 2011. (R. 12, 15).

Next, the ALJ found that the claimant had the severe impairments of disorders of the left wrist; disorders of the right ankle; degenerative disc disease; affective/mood disorder; and anxiety disorder. The ALJ noted that the claimant's medical records also indicated a history of ulcerative colitis; however, the ALJ found that the claimant did not allege any substantial limitations resulting from this condition, and consequently, this impairment was not severe. (R. 16).

The ALJ next found that the claimant did not have an impairment of combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for Listing 1.02 concerning disorders of the left upper extremity and the right lower extremity. To meet the listing, the claimant would have to demonstrate evidence of an inability to effectively ambulate or an inability to engage in fine and gross manipulation with either upper extremity. The ALJ determined that based on the claimant's medical history, his disorders did not cause any of these problems. The ALJ noted that the claimant's ankle injury occurred less

than twelve months prior to the decision and he did not have an inability to effectively ambulate; that the claimant's ability to perform some chores around the house, mow the yard, chop wood, and run errands further demonstrated his ability to ambulate effectively; and that, although the claimant's left upper extremity functioning is quite limited, he appeared to retain normal functioning in his right upper extremity. (R. 16).

Furthermore, the ALJ considered whether the claimant met the requirements of Listing 1.04 regarding disorders of the back. That Listing requires evidence of nerve root or spinal cord compromise resulting in specific symptomology. The ALJ determined that the claimant did not meet these requirements. (R. 16).

Additionally, the ALJ considered the claimant's mental impairments under Listings 12.04 and 12.06 and concluded that the severity of the mental impairments, considered singly and in combination, did not meet or equal the criteria of the listings. In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied. (R. 16).

In activities of daily living, the ALJ determined the claimant has a moderate restriction. The ALJ noted that the claimant's ability to perform some chores around the house, mow the yard, chop wood, and run errands is inconsistent with marked limitations. Regarding social functioning, the ALJ found that the claimant has moderate difficulties, noting that the claimant's ability to run errands and attend his child's sporting events is inconsistent with marked limitations. As for concentration, persistence, or pace, the ALJ determined the claimant has moderate difficulties because his ability to help his daughter with her homework and to engage in hazardous activities such as mowing the lawn and chopping wood is inconsistent with marked limitations. Concerning episodes of decompensation, the ALJ found that the claimant has experienced no episodes of decompensation of extended duration. The ALJ noted that the

claimant was hospitalized for three days after his suicide attempt and since that time has had no additional extensive hospitalizations. The ALJ ultimately decided that, because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitations and "repeated" episodes of decompensation, each of extended duration, his conditions do not satisfy "paragraph B." (R. 16-17).

Next, the ALJ also considered whether the claimant met the "paragraph C" criteria. The ALJ determined that, for Listings 12.04 and 12.06, the claimant did not satisfy either listing because the claimant's current living arrangement, where he lives with his young daughter and three disabled adults, is not of the highly supportive nature set forth by this criterion; the claimant's ability to perform errands, travel out of town, and attend his child's sporting events without any noteworthy concern does not constitute an inability to function outside of his home. (R. 17-18).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work but can occasionally stoop and crouch; can never climb; can only use his left upper extremity for assisting the right upper extremity and cannot use it for fine or gross manipulation; can never operate foot controls with the right foot and never drive; can perform simple, non-complex tasks where he primarily works with and around things as opposed to the general public; and should perform no work requiring him to meet production goals or quotas. (R. 18).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effect of these symptoms were not fully

consistent with the evidence. The ALJ found that the claimant had greater capabilities than alleged because of his ability to perform chores around the house, mow the yard, chop wood, and run errands. Specifically, the claimant alleged that he was limited to walking just 100 yards at a time and could lift up to ten pounds with the right hand, stand/walk up to thirty minutes at a time for a total of two hours per day, and sit for twenty minutes at a time. The ALJ noted that these activities, along with the claimant's ability to engage in hazardous activities, such as mowing the lawn or chopping wood, are inconsistent with marked limitations. (R. 17, 20, 21).

Regarding the claimant's spinal concerns, the ALJ noted that the claimant informed Dr. Jariwala that this condition had been present for at least a decade; however, the only objective imaging of record showed a normal cervical spine x-ray. The ALJ also noted that the claimant was engaged in heavy exertion work as a janitor as recently as January 2011. (R. 22).

Concerning the claimant's disorder of the right lower extremity, the ALJ determined that, while the treatment notes document some residual pain, the evidence failed to show that this condition is expected to persist at a level that would significantly impact the claimant's ability to ambulate. The ALJ admitted that the claimant's greatest concern would be his left upper extremity; however the ALJ determined that the claimant's right upper extremity testing revealed normality and the claimant's ability to cut firewood supports the assertion that the claimant can engage in significant exertion with the right upper extremity, using the left upper extremity as just an aide. (R. 22).

Regarding the claimant's psychological impairments, the ALJ found that, although the claimant's depression and anxiety complaints dated back to 2006, he was able to maintain work for another five years. The ALJ noted that the claimant's suicide attempt occurred in 2011, before he lost his job because of absenteeism. The ALJ found that, since 2011, the claimant's

suicidal tendencies have largely subsided. The ALJ noted that the claimant's February 2015 hospital visit was an attempt to secure general health treatment, instead of another suicide attempt. Furthermore, the ALJ also noted that the evidence of record showed improvement when the claimant took his medications. (R. 22).

Additionally, the ALJ determined that several other factors reduced the reliability of the claimant's subjective reports. While the claimant told Dr. Davis that he had no history of substance abuse, except for experimentation when he was younger, the ALJ found that treatment records from June 4, 2006 showed that the claimant stated to Dr. Reddy that he previously was an opiate abuser and had chronic methadone dependency. The ALJ also noted that the claimant testified that he generally isolates himself from others but he attends his children's sporting events and, in August 2013, went out of town. Consequently, the ALJ determined the claimant's subjective allegations of his symptoms and abilities were not fully credible. (R. 23).

The ALJ gave significant weight to the opinions of consultative examiners Dr. Hasmukh Jariwala and Dr. Dana Davis. First, the ALJ gave significant weight to the opinion of Dr. Jariwala that the claimant had no significant limitations aside from those affecting the left upper extremity. The ALJ noted Dr. Jariwala's record that the claimant could "button, tie his shoelaces, pick up small objects, hold a glass, and turn the doorknob" with his right hand and that the claimant's grip strength on his right hand was a 5/5. (R. 23).

The ALJ also gave significant weight to the opinion of Dr. Davis that the claimant's symptoms were of "only mild to moderate severity." Dr. Davis determined that the claimant was "pleasant, rather talkative." She also noted that "perhaps he exaggerated a bit throughout the interview and may not have been a totally credible client." The ALJ found Dr. Davis' opinion to be well-supported by the medical evidence. (R. 23).

In contrast, the ALJ gave little weight to the opinion of claimant's treating physician, Dr. James Yates, who opined limitations below the full range of sedentary exertion. The ALJ gave little weight to this opinion because he found that Dr. Yates' "own records fail to document symptomology consistent with his opinions," and that "his opinions are also inconsistent with the claimant's admissions and reports." The ALJ acknowledged that Dr. Yates was the claimant's treating physician, but stated that "[w]hile the opinion of a treating physician may be granted controlling weight if it is consistent with the evidence of record, in this case it is not." (R. 23).

Finally, the ALJ found that the claimant was unable to perform any of his past relevant work based on his residual functional capacity and the vocation expert Ms. Smith's testimony. The ALJ relied on Ms. Smith's testimony that based on the limitations in the residual functional capacity the claimant could work as a marker or a sorter I and that those jobs existed in significant numbers in the national economy. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 23-25).

## VI. DISCUSSION

The claimant argues that the ALJ did not give proper weight to the opinion of the claimant's treating physician Dr. Yates because substantial evidence does not support the ALJ's reasons for discrediting his opinion. This court agrees.

The ALJ listed two reasons for discrediting Dr. Yates' opinion regarding the claimant's limitations with absolutely no analysis to explain those reasons. The ALJ indicated that he gave Dr. Yates' opinion little weight because his "own records fail to document symptomology consistent with his opinions," and because Dr. Yates' "opinions are also inconsistent with the claimant's admissions and reports." Yet, the ALJ failed to explain any specific inconsistencies or explain with any degree of clarity how he reached these conclusions. He also failed to discuss

pertinent elements of Dr. Yates' opinion and explain how the opinion contradicts the record or the claimant's own statements about his activities of daily living. Those failures constitute reversible error. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). As the Eleventh Circuit has explained, the ALJ must clearly articulate and explain the grounds for his rejection of a treating physician's opinion and his failure to do so is reversible error. *Id.*

In fact, the ALJ's general statements to discredit the opinion of Dr. Yates, who treated the claimant for many years, themselves lack substantial evidence in the record. Dr. Yates' findings that the claimant had back spasms and lumbar tenderness upon physical examination could support his opinion that the claimant has standing and walking limitations, as well as difficulty lifting over ten pounds. The fact that Dr. Yates continued to prescribe potent narcotic pain medications also supports his opinions regarding the claimant's physical limitations.

Even though Dr. Yates' notes indicated that the claimant at times showed improvement or was doing "fairly well," he based his ultimate opinion on years of treating the claimant for both physical and mental impairments. Moreover, the claimant consistently complained to Dr. Yates about his mental impairments, and Dr. Yates diagnosed the claimant with generalized anxiety disorder and situational depression and prescribed the claimant Klonopin, a *strong* anxiety medication. Based on his treatment of the claimant for *six years*, Dr. Yates was in a better position to assess any physical or mental limitations of the claimant than the doctors who saw him once for a few hours. The ALJ's rejection of Dr. Yates' opinion without *explaining* his reasons for doing so was error.

In addition, the ALJ articulated that Dr. Yates' opinions are "inconsistent with the claimant's admissions and reports." Again, the ALJ failed to connect the dots, so the court has to guess what statements by the claimant about his daily activities the ALJ thought were

inconsistent with the limitations espoused by Dr. Yates. When the court has to surmise what the ALJ meant by his statements in discrediting Dr. Yates' opinions, the court "cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence." *See Winschel*, 631 F.3d at 1179. Thus, the court finds that the ALJ's decision should be reversed and remanded for the ALJ to articulate and explain with clarity his reasons for discrediting the opinion of the claimant's treating physician Dr. Yates.

*Other Concern*

The claimant also argued that the ALJ erred because substantial evidence does not support the reasons he gave to discredit the claimant's subjective testimony and statements regarding the limiting effects of his physical and mental impairments. Although the court does not reach this issue, it expresses concern that the ALJ failed to accurately depict in the decision the claimant's statements and activities of daily living. In discrediting the claimant's subjective statements about the limiting effects of his physical and mental impairments, the ALJ pointed to the facts that the claimant could do some household chores, mow the lawn, and cut firewood to show that his limitations were not as severe as the claimant alleged. However, the ALJ failed to discuss or mention the parts of the claimant's statements that limit his ability to do these activities. The ALJ left out the qualifying facts that the claimant indicated he does laundry *with the exception of folding and washing*; that his mother and brother assist him with completing household chores, such as cleaning his room; that he can mow the lawn *if he is riding a lawn mower*; and that he usually does not do yard work because he is either "too depressed or *physically unable to do so*."

Regarding the claimant's social activities, the ALJ opined that he only has "moderate difficulties" because the claimant attends "sporting events to watch his daughter cheer,"

sometimes spends time at his friend's house, and helps his daughter with her homework. However, the facts that the claimant on occasion watches his daughter cheer and spends time with his friends do not demonstrate a lack of social anxiety. The record indicates that the claimant participates in these activities "to help get things off [his] mind." The ALJ did not consider that the claimant stated in his Function Report that he "very rare[ly]" spends time with *others* because he "[doesn't] get out much." The facts that the claimant spends *limited* time with a *close* friend and watches his daughter perform do *not* mean he lacks the mental impairments that prevent him from working. Spending time with close friends and supporting his child are *vastly* different than regularly engaging with other people, and the claimant *attested* to this fact by stating he seldom spends time with others. The claimant does not have to be an invalid who does absolutely nothing and never leaves his home to be disabled and unable to work full-time. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (substantial evidence did not support the ALJ's finding that the claimant's ability to do simple household chores negated her claims that she had to lie down every two hours because of her impairments); *see also Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("[S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. . . . Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. . . . It is well settled that sporadic or transitory activity does not disprove disability.") (citations and quotations omitted.)

In addition, the ALJ also reasoned that the fact that the claimant can help his daughter with her homework means that he can concentrate well enough to sufficiently engage himself in an eight-hour work day. The ALJ seemed to overlook the fact that the claimant stated his daughter's homework consists of basic and simple problems, such as "two plus two." The claimant's mother

testified that *he even struggles with such basic problems*. Contrary to the ALJ's finding, the ability to calculate "two plus two" does not reflect an ability to concentrate during an eight-hour workday.  The ALJ disregarded crucial parts of the record and facts to support his discrediting of the claimant's subjective testimony about his physical and mental limitations.  On remand, the ALJ should accurately discuss the claimant's statements when determining whether to discredit them.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED for actions consistent with this Memorandum Opinion.

The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 24th day of September, 2018.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE